UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

CIVIL ACTION NO. 14-12558-RGS

ROGER SIMON

v.

HARVARD VANGUARD MEDICAL ASSOCIATES, INC.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

November 16, 2015

STEARNS, D.J.

Roger Simon alleges that Harvard Vanguard Medical Associates, Inc. (Harvard Vanguard), discriminated against him because of a learning disability, and, when he complained, then retaliated by terminating him. Simon's Complaint is framed under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, and Mass. Gen. Laws ch. 151B (Chapter 151B). Discovery is complete, and Harvard Vanguard moves for summary judgment on all counts of Simon's Complaint.[1]

---

[1]   The Complaint also made claims of race and national origin discrimination (Simon is a black man of Haitian descent).  Simon's counsel agreed at oral argument that these claims had failed to gain traction during discovery, and consequently, are scarcely mentioned in his brief.  The court will therefore deem these claims as waived.

## BACKGROUND[2]

Harvard Vanguard, among its other business interests, provides on-site medical services to nursing homes.  Harvard Vanguard hired Simon as a Patient Safety & Risk Management Specialist on November 8, 2011.  Simon's essential job functions included implementing patient safety programs at client nursing homes, reviewing site safety breaches, conducting site trainings and presentations, establishing relationships with patient healthcare providers, and answering client questions.

Prior to his employment at Harvard Vanguard, Simon was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).  Simon did not

---

[2] The facts are viewed (as they must be) in the light most favorable to Simon with this important caveat.  Rather than submitting a statement of disputed facts as required by Fed. R. Civ. P. 56(1), Simon attempts to simply identify facts that he disagrees with in his Memorandum of Opposition to Summary Judgment.  The failure of a nonmoving party to submit a statement of disputed facts has "the legal effect of 'admitt[ing]' the [moving party's] factual assertions."  *United States v. Parcel of Land*, 958 F.2d 1, 5 (1st Cir. 1992).  Under the First Circuit's "anti-ferreting" rule, parties opposing summary judgment are warned that "to preclude judgment as a matter of law, they must identify factual issues buttressed by record citations."  *Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 33 (1st Cir. 2001).  "[O]nce so warned, a party's failure to comply would, where appropriate, be grounds for judgment against that party."  *Id.*, quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 931 (1st Cir. 1983).

disclose his disability to Harvard Vanguard when he was hired.  The first few months of Simon's employment at Harvard Vanguard proved uneventful.[3]

In April and May of 2012, Dr. Beverly Loudin, Simon's direct supervisor, sent Simon five separate emails critical of his job performance.[4] In a lengthy email on April 5, 2012 concerning Simon's failure to complete an assignment, Loudin wrote, "I assume from our discussion this morning that you did not even start on this [task] until today when you realized that you were not even sure where to get the data.  I cannot stress enough that if I ask you to take on a task that you need to let me know before the date it is 'due' if I haven't given you enough guidance to complete the task successfully!"  Def. Ex. 4.

---

[3] Although Harvard Vanguard fairly observes that a number the acts of discrimination alleged by Simon fall outside the statute of limitations, the court may consider the entire scope of the claim including acts outside the statute of limitations so long as at least one act is within the statute. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

[4] In another email dated May 6, 2012, Loudin wrote, "There is absolutely no information in this presentation that is specific to [your site]. . . . Not sure where you pulled the . . . data but it is clearly erroneous. . . . The slide about [] is old and outdated."  Def. Ex. 7.  On May 15, 2012, Loudin, after receiving a report of an injured patient, wrote:  "This is a fall with fracture event and needs to be reported . . . within 7 days! . . . At this point in time, I would expect that you would recognize the fact that this is . . . an event that needed to be escalated immediately.  Can you recall any reason why you did NOT notify me or Ailish?"  Def. Ex. 8.

On May 22, 2012, Loudin requested a meeting with Harvard Vanguard's Human Resources Department (HR) to discuss "performance issues with Roger Simon." Def. Ex. 9. Later in May, Simon encountered difficulties in his dealings with one of his clients, Dedham Medical Associates (DMA). On May 30, 2012, managers at DMA complained about Simon's punctuality, frequent absences, and lack of preparation. He then failed to attend a staff meeting convened by Diane Shapiro, the Chief Operating Officer at DMA, who had requested his presence.[5] After Simon failed to appear, Shapiro demanded that Loudin replace him as DMA's liaison with Harvard Vanguard. Loudin then met with Simon to tell him that he was being relieved of his duties at DMA. During this meeting, Simon first disclosed his ADHD to Loudin.[6]

---

[5] Simon contends that he missed the meeting because Shapiro had never confirmed the invitation and because he was making a presentation that morning in Needham with a coworker, Ailish Wilkie. Pl. Aff. ¶ 50. Shapiro testified at her deposition that, "He was invited by me, the chief operating officer and the interim CEO, in a meeting with him in my office, and he accepted that and he told me he would be there." Pl. Ex. 6 at 51. However firm the invitation is beside the point -- it is undisputed that Simon had made a client unhappy and dissatisfied.

[6] Simon in a late affidavit gives a different sequence of events, maintaining that "[w]ithin a couple of days after disclosing [his] ADHD diagnosis to Dr. Loudin, [she] informed [him] that [he] had been removed from the DMA assignment." Pl. Aff. ¶ 55. However, in his earlier deposition, Simon answered, "yes" to the question, "[i]t was in the context of being notified of your being removed from the DMA site that you disclosed for the

In June, Simon and Loudin met with HR to discuss possible accommodations for Simon's ADHD.  Simon was given a disability form for his physician to complete.  Simon's doctor returned the form on August 30, 2012, recommending as accommodations, "[q]uieter, more isolated space for work, regularly or on and off[;] extra time for projects[; and] if possible some work from home."  Def. Ex. 19.

On August 7, 2012, Ailish Wilkie, the Senior Department Manager, notified Simon and two of his coworkers that she was undertaking a review of their safety event reports for "accuracy" and "thoroughness."  Def. Ex. 20. Several weeks later, on August 24, 2012, Loudin told Simon that his reports were "unacceptably poor."[7]  Def. Ex. 21.  She also stated that she wanted to

---

first time to Beverly Loudin your ADHD, correct?"  Def. Ex. 2 at 322.  "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

[7] Loudin testified that Wilkie had initially reviewed twenty safety event reports for each of the three Patient Safety and Risk Management Specialists. Concerned by the results of Wilkie's investigation, Loudin reviewed an additional fifty-two of Simon's reports.  Loudin deemed only 23% of Simon's reports to be error free, compared to 68% and 42% scores by his coworkers. Def. Ex. 22.  Simon argues in an after-the-fact affidavit that his own review of the safety event reports found that "the quality of the event files was virtually the same among the three PSRMS's."  Pl. Aff. ¶ 78.  Given the absence of any explanation of the methodology Simon employed to calculate

observe a "dry run" of an upcoming client presentation that Simon was scheduled to give.  Def. Ex. 22.  Following the audition, on August 26, 2012, Loudin sent an email to HR stating that Simon was "not capable of fulfilling the responsibilities of the job for which he was hired."  *Id.*  On September 11, 2012, Loudin sent a second email to HR stating that "it would be nice if [Simon] would realize where this is heading and leave quietly."  Pl. Ex. 11. She also prepared a Corrective Action Document (CAD), but did not share it with Simon, later noting that, "I was told I couldn't give Roger a warning on 9/12 because the ADA issues had not been addressed."  Pl. Ex. 9.

In September of 2012, as an accommodation for his ADHD, Simon was moved to a private cubicle to afford him "quieter, more isolated space for work." Def. Ex. 19.  However, he continued to receive negative feedback from Loudin and Wilkie, as well as from managers at Granite Medical Group, one of his assigned clients.  The managers complained that Simon's performance was "unsatisfactory," and that "[he] does not communicate with the physicians in the practice at all."  Def. Ex. 25.  On October 12, 2012, Loudin met with Simon to address instances of "rude" and "unprofessional" behavior towards coworkers.   Def. Ex. 25.   On October 16, 2012, Simon received

---

error rates, the court will give no weight to Simon's supposed findings.  *See Ayala-Gerena v. Bristol Myers-Squibb Co.,* 95 F.3d 86, 95 (1st Cir. 1996).

another unfavorable critique from Wilkie regarding a presentation that had to be cancelled because of his lack of preparation.  On October 25, 2012, Loudin sent an email to a coworker confiding her frustrations with Simon's performance, and asking, "[p]lease don't share with anyone that I have had ADA challenges with Roger."  Pl. Ex. 10.

On December 17, 2012, Simon received a formal admonition from Loudin over his failure to submit an event report regarding a patient suicide. Loudin wrote, "I am shocked that you have not looked at this case since you first notified me when it was filed . . . . Notifying me [of the suicide] does not absolve you of responsibility. . . . This is completely unacceptable." Def. Ex. 29.  Later in December, Simon complained to Loudin that he was being discriminated against by Wilkie and that she was "singling [him] out" and putting him under "high scrutiny." Def. Ex. 2 at 115-116.

On January 7, 2013, after Simon returned from holiday leave, Loudin placed him on a Performance Improvement Plan (PIP), warning that the failure to meet the four specified performance expectations would be grounds for his termination.[8]  In Loudin's judgment, Simon continued to underperform.  On January 27, 2013, she wrote a formal reprimand

---

[8] The four PIP expectations were for improvements in calendar management, presentation skills, quality of safety event review audits, and team dynamics.  Simon was also required to meet with a presentation coach.

7

regarding Simon's failure to respond promptly to a safety incident.  "This is an event from OCTOBER!  First and foremost, the fact that you are just reaching out to ask questions about this event 3 months after it was filed reflects incredibly poorly on our department."  Def. Ex. 32.  On February 4, 2013, a member of the audience at a presentation given by Simon wrote in an evaluation that, "My perception was that he could have presented the information in a more organized way. It could just be his presentation style, but, it gave [t]he impression he was not an expert on what was being presented."  Def. Ex. 36.  On February 15, 2013, an auditor at another of Simon's presentations wrote, "Was not a smooth speaker. Appeared not to fully know his material he was presenting to the group." Def. Ex. 38.  Finally, on February 17, 2013, Simon received a fourth and final review of his PIP progress.  Simon was judged to have successfully achieved only one of his four performance goals.[9]

On February 22, 2013, Harvard Vanguard terminated Simon's employment.   Simon filed timely charges with the Massachusetts

---

[9] Simon states that he had completed the PIP successfully.  However, the language of the PIP suggests otherwise, and Simon offers no evidence other than his subjective self-assessment to support his contention.  "'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff" in determining discriminatory animus. *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 15 (1st Cir. 1998), citing *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960-961 (4th Cir. 1996).

Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission.   He filed this Complaint in the federal district court on June 18, 2014.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As such, the non-moving party is given the benefit of all favorable inferences.  *See Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir. 1988).   "The mere existence of *some* alleged factual dispute between the parties will not [, however,] defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-248 (1986) (emphasis in original). Furthermore, "[e]ven in cases where elusive concepts such as motive or intent are at issue," such as an employment discrimination case, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

**Disability Discrimination**

To obtain relief under the ADA, a plaintiff must prove three things. "First, that he was disabled within the meaning of the Act.  Second, that with or without reasonable accommodation he was able to perform the essential functions of his job.  And third, that the employer discharged him in whole or in part because of his disability." *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 30 (1st Cir. 1996).  Under EEOC regulations, an individual who is not disabled but who is nonetheless perceived as such by his employer, may also recover. *Id.* at 32-33; 29 C.F.R. § 1630.2(l)(1).  When a plaintiff, as is the case with Simon, has but scant direct evidence of discrimination, a court will look to the three-stage burden-shifting analysis of circumstantial evidence set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10]  Under the *McDonnell Douglas* framework, it falls to Simon to first make out a prima facie case of disability discrimination by showing that: (i) he has a disability within the meaning of the Act; (ii) that he is nonetheless able to perform the essential functions of his job, with or without reasonable accommodation; (iii) that he suffered an adverse employment action (termination); and (iv)

---

[10] In applying the disability provisions of Chapter 151B, Massachusetts courts are guided by case law construing the federal Rehabilitation Act of 1973, 29 U.S.C. § 794, and the ADA.  *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (1997); *Garrity v. United Airlines, Inc.*, 421 Mass. 55, 59-60 (1995).  Consequently, there is no need to discuss Simon's state and federal disability discrimination claims separately.

that the employer replaced him with a non-disabled person or otherwise sought to fill the job.  *See Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir. 1996); *Dartt v. Browning-Ferris Indus., Inc.*, 427 Mass. 1, 3 (1998); c*f. Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir. 1991) (the prima facie standard is "quite easy to meet").

ADHD, in its severe life-limiting form, qualifies as a disability for purposes of the anti-discrimination laws. *Cf. Wright v. CompUSA, Inc.,* 352 F.3d 472, 477 (1st Cir. 2003) ("ADD does not constitute a disability under the ADA without a showing of substantial limitation of a major life activity.").  It also goes without saying that termination amounts to an adverse employment action.  And finally, Harvard Vanguard does not suggest that Simon's position as a Patient Safety Specialist had become redundant.  The issue is rather joined over the second element -- whether Simon was able (with or without a reasonable accommodation) to perform the essential functions of the Patient Safety Specialist's job.  As the battle over this element tends to be fought with less intensity at the first as opposed to the third stage of *McDonnell Douglas*, for expedience I will move on to the second stage of the analysis in anticipation of a quick return to the fray.

At the second stage of *McDonnell Douglas*, the burden shifts to Harvard Vanguard to produce a legitimate, non-discriminatory explanation

for Simon's termination.   Harvard Vanguard maintains that Simon was terminated because of substandard performance, and for no other reason. Harvard Vanguard's burden in this regard is solely one of production – the court does not sit as a "super personnel department," reviewing the merits — or even the rationality — of an employer's proffered nondiscriminatory justification of a business decision.  *Mesnick,* 950 F.2d at 825.  Because bad performance – fairly evaluated or not – is the quintessential justification for an employee's termination, Harvard Vanguard easily meets its burden of production.

At the third stage of *McDonnell Douglas*, Simon has the burden of showing that Harvard Vanguard's proffered explanation for his termination is pretextual and that "the [true] basis of the employer's decision was unlawful discrimination."  *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 84 (1st Cir. 2004).  There are several approaches a plaintiff may take in the effort to establish pretext. He may produce direct evidence of discrimination, for example, statements made by decision makers revealing a discriminatory bias.  He may compare himself with other employees who are not disabled and were not disciplined, but he "must provide a suitable provenance for the evidence by showing that others similarly situated to him in all relevant respects were treated differently by the employer."  *Conward*

12

*v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999). A third approach he may take is by highlighting the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (citations omitted). Nevertheless, "[e]ven in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with unsupported allegations and speculations, but rather must point to specific facts detailed in affidavits and depositions – that is, names, dates, incidents, and supporting testimony – giving rise to an inference of discriminatory animus." *Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir. 1994), quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988).

Simon's proffered evidence of pretext fits largely into the first and third of the approaches. Simon first cites an email sent by Loudin on February 14, 2013, to a coworker stating that, "I am sorry to be cc'ing you on all of the exchanges with Norm [in HR] but I feel like he keeps slapping my wrist and I feel that I need to defend myself . . . I understand that Norm is trying to give Roger the benefit of the doubt but I have been doing that since the summer

13

when I first went to Norm about my concerns with Roger's performance and I no longer think that he deserves it. I truly do not trust Roger." Pl. Ex. 17. Simon's gloss on this email has Loudin "express[ing] frustration with the Human Resources [D]epartment 'interfering' with her goal of termination Mr. Simon's employment." Pl. Statement of Facts (SOF) ¶ 157. This seems a fair reading of Loudin's growing frustration with Simon and her desire to have him fired sooner rather than later, but it exhibits nothing in the nature of a disability-based animus.

The second, and possibly more telling item, is an October 25, 2012 email, in which Loudin asked "Pat[11] . . . [p]lease don't share with anyone that I have had ADA challenges with Roger. That is obviously something that I was sharing in confidence in response to the feedback that you kindly gave me."[12] Pl. Ex. 10. Can an isolated ambiguous remark made over the course

---

[11] "Pat" is presumably Pat Carrroll, the Chief Medical Officer for Granite Medical Group, one of Harvard Vanguard's clients. Carroll had been one of the site managers who had previously complained to Loudin about Simon's performance.

[12] Simon argues that this email violated his right to privacy under MCAD/EEOC guidance discouraging "comments indicating that [an employee's] handicap was perceived by the employer as an unwarranted expense or as a negative attribute." Pl. Opp'n at 11. While the guidance notes may comment on what can constitute evidence of disability discrimination (Simon fails to provide supporting citation), it could not purport to create any actionable right to be free of such comments. *See August v. Offices Unlimited, Inc.*, 981 F.2d 576, 583 (1st Cir. 1992) (Even if employer's alleged

of a two-year employment relationship fairly support a jury verdict of discrimination?  Under the so-called "stray remarks doctrine" articulated by Justice O'Connor in her concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989), the answer is, "No."[13]  The doctrine holds that "[r]emarks that are 'arguably probative of bias,' may now not be probative at all unless they were (a) related to the employment, (b) made close in time to the employment decision, (c) uttered by decisionmakers or those in position to influence the decisionmaker, and (d) unambiguous.  *Diaz,* 762 F. Supp. 2d at 335, citing *Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 36 (1st Cir. 2001).

Although Loudin's remark about "ADA challenges" appears on the rim of the temporally remote, coming as it did some four months before Simon was terminated, *see Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 25-26 (1st Cir. 2004) (three and four month gaps between a "stray" remark and an adverse employment decision held insufficient to support a causal

---

negative attitude caused sales employee suffering from severe depression further psychic injury, employee did not have cause of action for discriminatory discharge on account of handicap).

[13] Although *Price Waterhouse* is a "mixed-motive" case, "[courts have extended the "Stray Remarks Doctrine" beyond mixed-motive cases, to the pretext analysis in *McDonnell Douglas* and beyond."  *Diaz v. Jiten Hotel Mgmt., Inc.,* 762 F. Supp. 2d 319, 335 (D. Mass. 2011).

connection), Loudin, as Simon's supervisor, had an influential voice in the decision to let him go.  But even weighing that factor in Simon's favor, the statement is susceptible of several interpretations.   It might reflect pessimism on Loudin's part as to whether Simon would be able to overcome the limitations of his ADHD.  Or less benignly, it might reflect reluctance on Loudin's part to consider accommodations causing disruption to her schedule and those of her other employees.   Or it might reveal Loudin reaching out to a confidant for advice on the types of accommodation that might be made to bring Simon back on line.  In sum, this single remark is simply too ambiguous to carry the heavy weight that Simon assigns to it, particularly in light of the unrebutted dossier compiled by Harvard Vanguard of his markedly deficient job performance.  *See Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 329 (1st Cir. 1996) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent."); *see also Straughn,* 250 F.3d at 36 ("[E]ven if we were to assume that the assertedly offensive workplace [remark] is somehow suggestive of racial bias, it would not be significantly probative of pretext absent some discernible indication

that its communicative content, if any, materially erodes the stated rationale for the challenged employment action."). [14]

**Failure to Accommodate**

Simon next alleges a failure on the part of Harvard Vanguard to accommodate his disability.  To prevail on this claim, Simon must show that he would have been able to perform the essential functions of his job with a reasonable accommodation, and that Harvard Vanguard, despite knowing of his disability, failed to offer such an accommodation.  *See Rocafort v. IBM Corp.*, 334 F.3d 115, 119-120 (1st Cir. 2003). In late August of 2012, Simon submitted to Harvard Vanguard his doctor's report requesting "[q]uieter, more isolated space for work, regularly or on and off[;] extra time for projects[; and] if possible some work from home."  Def. Ex. 19.  Of these requests, Simon admits that Harvard Vanguard refused only his request to work from home.  It is hornbook law that "[a]n employer need not accommodate a disability by foregoing an essential function of the job." *Laurin v. Providence Hosp.*, 150 F.3d 52, 56 (1st Cir. 1998); *see also E.E.O.C. v. Amego, Inc.,* 110 F.3d 135, 147 (1st Cir. 1997) (considerable deference is given to the employer's judgment as to what is an "essential function" of a

---

[14] Simon's remaining piece of evidence, his positive self-evaluation of his progress in completing the PIP, the court gives little or no weight for the reasons explained in footnote 9, *supra*.

job); *Dziamba v. Warner & Stackpole LLP*, 56 Mass. App. Ct. 397, 405 (2002) ("To fulfill their obligation of a reasonable accommodation to a handicap, employers need not make substantial changes in the standards of a job."). While in a modern wired economy, there are many jobs that can be satisfactorily performed from home; Simon's position at Harvard Vanguard was not one of them. Simon himself conceded at deposition that the essential functions of the job that he could not perform by telecommuting included conducting client training sessions and presentations, establishing a personal rapport with healthcare provider- clients, investigating safety lapses, and being an on-site resource for clients. In other words, the job itself.

**Retaliation**

It is well settled that an ADA plaintiff need not succeed on a disability claim to assert a claim for retaliation. *See Wright,* 352 F.3d at 477. Title VII "makes it 'unlawful for an employer to discriminate against any of [its] employees . . .' who have [] availed themselves of Title VII's protections . . . ." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 339 (1997), quoting 42 U.S.C. § 2000e-3(a). Simon cites three instances in which he engaged in protected activity for which he was eventually punished: (1) in late May when he disclosed his ADHD to Loudin; (2) in late August when he submitted his

doctor's list of requested accommodations; and (3) in December when he complained to Loudin that he believed he was being discriminated against by Wilkie.   To make out an actionable claim of retaliation, Simon must show that: "(1) [h]e engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was casually connected to the protected activity."   *Hernandez-Torres v. Intercont'l Trading, Inc.,* 158 F.3d 43, 47 (1st Cir. 1998).   The third element requires the showing of a "but for" connection between Simon's protected activity and Harvard Vanguard's allegedly retaliatory action (his termination).   *See Univ. of Texas SW. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2534 (2013).

Assuming that each of the three instances in fact involve protected activity, Simon contends that "[t]he facts and evidence wholly support that Dr. Loudin displayed discriminatory animus towards Mr. Simon . . . in retaliation or [sic] complaining that he was a victim of discrimination, and that these were the motivation for the ultimate termination of Mr. Simon's employment."   Pl. Opp'n at 12.   Simon contends that shortly after he disclosed his ADHD to Loudin, he was removed from the DMA site, while Loudin "began to manipulate the safety event reporting data to skew the results of her 'quality control' audits against Mr. Simon," *id.* at 11; that when he requested an accommodation, she secretly prepared a CAD; and finally,

in December, when he complained about Wilkie, she placed him on a PIP as a prelude to his termination.

As for the first charge, even assuming that Simon was reassigned from the DMA site *after* disclosing his ADHD (the evidence strongly suggests otherwise), Simon offers nothing to rebut Harvard Vanguard's evidence that he was removed from the site because the client (DMA) demanded it. Similarly, the accusation that Loudin further retaliated by "skewing safety data" is a canard without even a scintilla of fact in the record to support it. Simon's next suggestion is that Loudin responded to his request for an accommodation by preparing a CAD to blaze a "paper trail" justifying his eventual dismissal. Pl. Opp'n at 11. There is no evidence, however, that the CAD ever issued or led to any material change in Simon's conditions of employment. *See Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir. 2002); *see also Al-Raheem v. Covenant Care,* 2011 WL 4628698, at *6 (E.D. Cal. Oct. 3, 2011) ("[T]he alleged Corrective Disciplinary Action does not amount to an adverse employment action because Plaintiff did not allege that she experienced any change in employment status as a result of that document."). The evidence rather is that every one of Simon's reasonable requests for accommodations was met.

Finally, Simon alleges that after he complained to Loudin about being discriminated against by Wilkie, he was placed on a PIP.   Placing an employee on an improvement plan without any changes in his conditions of employment again fails the adverse action test.   *See James v. C-Tran*, 130 Fed. App'x 156, 157 (9th Cir. 2005) ("Because the performance improvement plan was non-disciplinary training that did not materially impact [the employee's] compensation, terms, conditions, or privileges of employment, it was not an adverse employment action"); *Brown v. Am. Golf Corp.*, 99 Fed. App'x. 341, 343 (2d. Cir. 2004) (same); c*f. Spears v. Missouri Dep't of Corr. and Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) ("An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.").

Simon's PIP clearly warned that: "If you are unsuccessful in meeting/maintaining the performance expectations outlined in this Performance Improvement Plan by the end of the P.I.P. period or subsequently within twelve months of the completion date, your employment with HVMA may be terminated at that time."   Def. Ex. 31. Harvard Vanguard cites its reason for terminating Simon's employment as his failure to meet the expectations of the PIP.   In the absence of any material

evidence rebutting this nondiscriminatory explanation, Simon's retaliation case does not clear the summary judgment hurdle.  Were it otherwise, an employer would have no incentive to give an employee failing to meet workplace expectations the opportunity to salvage his job by demonstrating an ability to improve.  The law of retaliation does not intend an employer's offer of a second chance to become a guarantee of life tenure (for fear of litigation) no matter how little advantage the employee takes of the opportunity.

ORDER

For the foregoing reasons, Harvard Vanguard's motion for summary judgment is ALLOWED.  The Clerk will enter judgment for Harvard Vanguard on all counts of the Complaint and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE